UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

BRYAN ALEXANDER MACDONALD,

    Plaintiff,

v.

CLIFTON HAROLD; CLINT RILEY,

    Defendants.

Case No. 6:20-cv-00931-AA

OPINION AND ORDER

AIKEN, District Judge.

    Plaintiff, a former pretrial detainee at Lane County Adult Corrections (LCAC), filed this action pursuant to 42 U.S.C. § 1983 and alleged violations of his federal constitutional rights arising from LCAC's response to the COVID-19 pandemic and alleged retaliatory actions taken against him. Defendants now move for summary judgment on all claims. Plaintiff fails to present evidence raising genuine issues of material fact to defeat summary judgment, and defendants' motion is granted.

1 - OPINION AND ORDER

BACKGROUND

On January 27, 2020, plaintiff was booked into LCAC as a pretrial detainee. Plaintiff remained incarcerated at LCAC until July 28, 2020, when he was transferred to the custody of the Oregon Department of Corrections. Rice Decl. ¶ 29 (ECF No. 61).

On February 28, 2020, Oregon announced its first presumptive case of COVID-19, a highly contagious and airborne virus. *See* https://www.oregon.gov/oha/ERD/Pages/Oregon-First-Presumptive-Case-Novel-Coronavirus.aspx.; https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19. By March 8, 2020, Governor Kate Brown had declared a state of emergency in Oregon and began issuing executive orders designed to combat the spread of COVID-19. *See* Or. Ex. Order No. 20-03 (Mar. 8, 2020); *Maney v. Brown*, 464 F. Supp. 3d 1191, 1198 (D. Or. 2020).

On March 15, 2020, LCAC began implementing measures in response to the COVID-19 pandemic. Rice Decl. ¶ 3. LCAC staff began screening new inmates and placing them in isolation, quarantine, or observation, and jail staff increased sanitation measures. *Id.* ¶ 4-6. As of April 9, 2020, LCAC required inmate workers to wear masks and gloves. *Id.* ¶ 5. The inmate population at LCAC was eventually reduced by almost one third (from 382 to 260) through a coordinated effort between the state Circuit Court and jail officials. *Id.* ¶ 16. This reduction allowed LCAC to better implement recommended physical-distancing measures among inmates. *Id.* ¶ 17.

To reduce the number of individuals entering the facility, LCAC suspended in-person social visitation and religious services. Rice Decl. ¶¶ 19-20. Inmates' attorneys were provided with remote access to their clients and could request in-person meetings governed by strict safety measures. *Id.* ¶¶ 25-26. Inmates remained able to engage in social visitation through telephone

2 - OPINION AND ORDER

and video calls, and LCAC claims it provided complimentary minutes of telephone and video visits. *Id.* ¶ 19. In lieu of in-person religious services, inmates could view pre-recorded services conducted by LCAC's chaplain or request individual meetings with the chaplain or other religious volunteers. *Id.* ¶¶ 21-23. Religious reading materials also remained available to inmates. *Id.* ¶ 24.

Prior to May 19, 2020, COVID-19 testing at LCAC was available to inmates who had known contact with a person who tested positive for COVID-19 or inmates who had experienced specific symptoms of the virus, such as a high temperature and respiratory symptoms. Rice Decl. ¶ 7; Quillan Decl. ¶ 2 (ECF No. 83). On May 19, 2020, every LCAC inmate was offered the opportunity to be tested for COVID-19. If a new inmate declined to be tested, the inmate was placed in a single cell for fourteen days. Rice Decl. ¶ 8. If any inmate experienced symptoms consistent with COVID-19, the inmate was tested for COVID-19 and all inmates in that unit were housed in separate cells pending the test result. *Id.* ¶ 9.

As of July 20, 2020, LCAC had tested 1,108 inmates for COVID-19; two inmates tested positive and fifty-five were awaiting the return of test results. Rice Decl. ¶¶ 11-12. Plaintiff was not one of the inmates who tested positive. The two inmates who tested positive were kept in isolation, quarantine, or observation until they were released from the facility. *Id.* LCAC subsequently determined that the two inmates became infected with COVID-19 prior to being booked into LCAC. *Id.* ¶ 15. As of July 28, 2020, no LCAC deputies reported positive test results for COVID-19. *Id.* ¶ 13.

While plaintiff was incarcerated at LCAC, he initiated a hunger strike to protest the conditions at LCAC and indicated his intent to file suit against LCAC officials. Rice Decl. ¶ 35.

On June 9, 2020, plaintiff filed this federal action.

3 - OPINION AND ORDER

DISCUSSION

Plaintiff raises several claims arising from defendants' response to the COVID-19 pandemic. First, plaintiff alleges that defendants exhibited deliberate indifference to his health and safety in violation of the Fourteenth Amendment by failing to take adequate safety measures to protect inmates from COVID-19. Second, plaintiff claims that LCAC's suspension of in-person visitation and religious services interfered with his Sixth Amendment right to counsel and violated his First Amendment rights of association and religious freedom. Third and finally, plaintiff alleges that jail officials retaliated against him because he exercised his First Amendment right to file grievances and pursue legal action. *See* Sec. Am. Compl. (ECF No. 36).

Defendants move for summary judgment on all claims. To prevail on their motion, defendants must show there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the evidence and draw all reasonable inferences in the light most favorable to plaintiff. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

A. COVID-19 Safety and Testing Measures

Plaintiff alleges that defendants failed to implement adequate safety measures in response to the COVID-19 pandemic. Defendants counter that LCAC officials responded as best they could with the limited information and resources available to them and that plaintiff fails to show deliberate indifference to his health or any resulting harm.

As a pretrial detainee at LCAC, plaintiff's rights derived from the Due Process Clause of the Fourteenth Amendment rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n. 16 (1979). While a deliberate indifference standard applies to all claims alleging unsafe prison conditions, Fourteenth

Amendment claims brought by pretrial detainees are evaluated pursuant to an objective standard of deliberate indifference rather than the partially subjective standard applicable to Eighth Amendment claims.[1] *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (holding that that claims arising from the conditions of confinement "brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard").

> Under this standard, plaintiff must present evidence showing that:
>
> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved…; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Plaintiff presents insufficient evidence to demonstrate that LCAC officials acted with deliberate indifference to the serious risks posed by COVID-19.

During plaintiff's incarceration at LCAC, jail officials isolated new arrestees and inmates experiencing symptoms of COVID-19, increased sanitation measures, suspended in-person visitation to reduce the risks of infection posed by visitors, provided masks and gloves to inmates, and eventually provided COVID-19 testing to the entire inmate population. *See generally* Rice Decl. Plaintiff presents no evidence that these measures were ineffective or

---

[1] Generally, a deliberate indifference claim under the Eighth Amendment requires: 1) an objective showing that the deprivation was "sufficiently serious" and 2) a subjective showing that the defendant was aware of the risk to the prisoner's health or safety and deliberately disregarded that risk. *Farmer v. Brennan,* 511 U.S. 825, 834, 847 (1994).

5 - OPINION AND ORDER

unreasonable under the circumstances or that the lack of additional measures placed him and other inmates in danger. To the contrary, LCAC did not experience a COVID-19 outbreak while plaintiff was detained at LCAC, and at the time of plaintiff's transfer from LCAC, no deputies and only two inmates had tested positive for COVID-19. Notably, those inmates became infected before they were booked into LCAC.

Plaintiff does not dispute these facts. Instead, plaintiff contends that LCAC officials exhibited deliberate indifference by failing to test him for COVID-19 when he experienced a sore throat in March 2020. Pl.'s Resp. at 7-8 (ECF No. 81). However, testing for COVID-19 was not widely available in March 2020, and LCAC tested only those inmates who had 1) known contact with a person who tested positive for COVID-19 or 2) a fever of at least 100.4 degrees combined with a lower respiratory symptom, such as a cough, sore throat, or shortness of breath. Quillan Decl. ¶ 2. Plaintiff did not report a fever in March 2020 and did not meet the criteria to receive a COVID-19 test. *Id.* ¶¶ 3-4. Given the limited resources available, I do not find that LCAC was deliberately indifferent to plaintiff's health or safety by limiting testing to inmates who were exposed to COVID-19 or had exhibited two established symptoms. Moreover, plaintiff does not allege that defendants failed to provide medical care for his symptoms in March 2020, and he alleges no harm caused by the failure to administer a COVID-19 test at that time.

Plaintiff also emphasizes that LCAC officials did not require jail staff to wear masks at all times until July 2020. Pl's Resp. at 5-6, 8-10. Defendants counter that guidance regarding the necessity or efficacy of masks was inconsistent and confusing in the early stages of the pandemic, and the Oregon Health Authority did not impose a mask mandate in Lane County until July 2020. *See* Defs.' Reply at 3-6; *see also* https://www.oregon.gov/oha/ERD/Pages/OHA-Announces-New-Mask-Requirements-Website.aspx.

6 - OPINION AND ORDER

I note that in late March of 2020, the Centers for Disease Control and Prevention recommended that correctional staff wear face masks and other protective gear in certain situations. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 1, 24-25 & Table 1 (Mar. 27, 2020) (found at https://www.bop.gov/foia/docs//CDCCorrectionalfacilityguidance3.23.pdf); *see also* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html; *Maney*, 464 F. Supp. 3d at 1198. Given this recommendation and the threat posed by COVID-19, LCAC officials could have, and perhaps should have, imposed staff masking requirements before July 2020 in an abundance of caution. However, I cannot find that the failure to do so constitutes deliberate indifference when only two inmates tested positive for COVID-19 during plaintiff's incarceration, and those inmates became infected before being booked into LCAC.[2] While these facts are not necessarily dispositive of plaintiff's claims, they support the reasonableness of LCAC's safety measures at that time.

Plaintiff presents no evidence raising a genuine issue of material fact necessary to sustain a Fourteenth Amendment claim arising from LCAC's response to the COVID-19 pandemic. Accordingly, summary judgment is granted on this claim.

B.  Restrictions on In-Person Visitation and Religious Services

    a.  Right to Counsel

Plaintiff's claims that LCAC's restrictions on in-person visitation interfered with his Sixth Amendment right to counsel by hindering his ability to speak confidentially and review

---

[2] Defendants make a passing reference to the lack of available personal protective equipment (PPE) in 2020, and the CDC correctional guidance anticipated shortages of PPE such as masks. Defs.' Reply at 1. Had either party presented evidence on the subject, the Court would have considered the lack of available PPE and masks when assessing the reasonableness of defendants' COVID-19 response.

7 - OPINION AND ORDER

evidence with counsel. Defendants argue that LCAC imposed visitor restrictions to limit the potential spread of COVID-19 and protect the health and safety of inmates and staff. Defendants emphasize that LCAC officials did not forbid all in-person meetings between inmates and counsel and provided other means for inmates and counsel to communicate.

Criminal defendants have a Sixth Amendment right to the effective assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335, 339-41 (1963). "The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and have him investigate the case and prepare a defense for trial.'" *Kansas v. Ventris,* 556 U.S. 586, 590 (2009) (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)). At the same time, "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). In the prison context, regulations that impede an inmate's constitutional rights will be upheld if the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Under *Turner*, the Court must consider four factors when assessing the reasonableness of a prison regulation: 1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources"; and 4) whether "the existence of obvious, easy alternatives" shows that "the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89-90 (internal quotation marks omitted).

Given the highly contagious and potentially deadly nature of COVID-19, LCAC's visitation requirements and restrictions were rationally related to the legitimate goal of reducing the risk of COVID-19 infections and protecting the health and safety of inmates, jail staff, and visitors. Further, LCAC provided alternative means for inmates to communicate with attorneys, and plaintiff does not dispute that he could communicate with counsel by telephone or that counsel could have requested and arranged for in-person visitation. Plaintiff presents no evidence suggesting that LCAC officials denied a visitation request from his attorney or otherwise prevented plaintiff from communicating with his attorney. The resumption of in-person visitation would have negatively affected LCAC by exposing inmates, staff, and visitors to a greater chance of COVID-19 infection and requiring LCAC to take additional safety measures to accommodate unrestricted in-person visitation between inmates and counsel. Finally, in light of the risks posed by COVID-19, LCAC's measures were not exaggerated and unreasonable.

Accordingly, LCAC's restriction on visitors was rationally related to the goal of protecting health and safety and did not impermissibly infringe on plaintiff's right to counsel. *See United States v. Topps*, 2020 WL 5890433, at *14-16 (D. Alaska Oct. 1, 2020) (upholding visitor restrictions imposed in response to the COVID-19 pandemic); *United States v. Kemmerer*, 2020 WL 4697982, at *9-10 (S.D. Cal. Aug. 13, 2020) (accord).

    b.  Freedom of Association

Next, plaintiff contends that LCAC's suspension of in-person social visitation violated his First Amendment right of association. Defendants maintain that LCAC's restrictions were reasonable under the circumstances did not unduly burden plaintiff's rights.

While an inmate's right of association is not "altogether terminated by incarceration," the Supreme Court has recognized that "freedom of association is among the rights least compatible

with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). As with plaintiff's right to counsel, this Court must look to whether LCAC's restrictions on visitation were rationally related to "legitimate penological interests" and whether plaintiff had alternative means to exercise his rights. *Id.* at 132.

LCAC suspended in-person visitation to reduce the number of people entering the facility and lessen the risk of exposing inmates, staff, and visitors to persons infected with COVID-19. Faced with the highly contagious and potentially deadly nature of COVID-19, LCAC's suspension of in-person visitation was more than rationally related to the legitimate goal of protecting the health and safety of inmates, jail staff, and visitors. LCAC provided alternative means for inmates to associate with friends and family through telephone and video visits and provided complimentary telephone minutes. As noted above, the resumption of in-person visitation would have significantly affected LCAC's operations and increased the risk of infection, and for those reasons, LCAC's measures were not exaggerated.

Plaintiff nonetheless asserts that "free video visits" were unavailable for "periods of time," but he does not specify when these alternatives were unavailable, for how long, or for what reason. Pl.'s Resp. at 13. Moreover, plaintiff does not dispute that he made numerous telephone calls and was otherwise able to communicate with people outside the facility. *See* Rice Decl. ¶ 38.

Plaintiff also argues that the suspension of visitation was not necessary because in-person visitation "behind Plexiglas air tight barriers" would have addressed LCAC's concerns. Pl.'s Resp. at 14. Even if plaintiff's highly dubious assertion was correct, Plexiglas barriers would not have provided protection between visitors and jail staff, who could have infected each other with COVID-19 and others inside and outside of LCAC.

Thus, LCAC's restrictions on in-person visitation were reasonable under the circumstances and did not impermissibly restrict plaintiff's right of association.

    c. <u>Free Exercise of Religion</u>

Plaintiff also alleges that LCAC's suspension of in-person religious services violated his right to the free exercise of his religion. Defendants again argue that LCAC's measures were reasonably and necessary to protect the safety of inmates, staff, and visitors, and that alternative means of worship were provided to inmates.

The right to religious freedom prohibits government entities or officials from imposing a substantial burden on the exercise of sincerely-held religious beliefs. *Jones v. Williams,* 791 F.3d 1023, 1031, 1033 (9th Cir. 2015). "[G]overnment action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs." *Id.* at 1033. While the "right to exercise religious practices and beliefs does not terminate at the prison door," an inmate's right "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987); *see also O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987).

For the reasons explained above, LCAC's suspension of in-person religious services was rationally related to the legitimate goal of preventing the spread of COVID-19 and was not an unreasonable or exaggerated response. In lieu of in-person services, LCAC provided inmates with access to religious materials and weekly recorded services and offered inmates the opportunity to arrange telephone or video visits with the chaplain or religious volunteer. Rice Decl. ¶¶ 21-23, 39; Peters Decl. ¶ 2 (ECF No. 84).

11 - OPINION AND ORDER

Plaintiff primarily complains that pre-recorded services were often unavailable or repetitive and individual meetings with clergypersons were not accommodated. However, plaintiff presents no evidence rebutting defendants' contention that pre-recorded services were available on a weekly basis with a few exceptions, Peters Decl. ¶ 2, and no evidence suggests that LCAC officials denied any request for an individual meeting with a clergyperson. To the contrary, the record reflects that plaintiff signed up for and attended religious services on two occasions and did not request an individual meeting. Counsel Decl. Exs. 1-2 (ECF No. 62). Moreover, plaintiff presents no evidence suggesting that the suspension of in-person religious services coerced him to forgo sincerely-held beliefs or engage in conduct contrary to his beliefs.

Accordingly, plaintiff fails to establish that LCAC officials imposed a substantial burden on the exercise of his religious beliefs, and summary judgment is granted on this claim.

C. Retaliation

Finally, plaintiff alleges that defendants retaliated against him because he exercised his First Amendment right to lodge complaints and file legal claims against LCAC officials. Specifically, plaintiff alleges that defendants retaliated by: 1) issuing a false misconduct report that led to disciplinary sanctions; 2) moving him four times during the week he was in disciplinary housing, causing a delay in his mail; 3) scheduling dayroom time in disciplinary housing with inmates who were "way out of" his custody level; 4) placing plaintiff's "phone book" and his grievance about a higher-level custody inmate in the property box of that particular inmate; and 5) leaving him in quarantine for an unspecified time after he tested negative for COVID-19. Sec. Am. Comp. ¶¶ 22-26.[3]

---

[3] Plaintiff also alleged that jail officials retaliated against him by telling other inmates that plaintiff's legal complaints were the reason extra food trays could no longer be provided and telling inmate workers they must stop passing messages for plaintiff or risk the loss of privileges. Sec. Am. Compl. ¶¶ 27-28. For the reasons explained in the Court's Order denying plaintiff's

12 - OPINION AND ORDER

To prevail on a § 1983 claim for First Amendment retaliation, plaintiff must establish that defendants took "adverse action" against him "because of" constitutionally protected conduct, and that action "chilled" the exercise of his First Amendment rights and failed to "advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). Plaintiff fails to establish these elements.

As an initial matter, plaintiff fails to establish the factual basis for several of his retaliation claims. Plaintiff presents no evidence, such as custody or housing records or discovery responses, showing that LCAC officials moved him four times in one week, placed him with higher custody-level inmates, or left him in quarantine. For this reason alone, plaintiff fails to meet his burden as to these claims.

Further, in his response to defendants' motion, plaintiff does not contend that defendants' actions had a chilling effect on his protected conduct and, aside from the disciplinary sanction against him, plaintiff fails to show that he suffered "harm that is 'more than minimal.'" *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (explaining that a "plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm that is more than minimal") (internal citations and quotation marks omitted). Plaintiff presents no evidence suggesting that he suffered more than minimal harm from being moved to different cells, sharing dayroom time with higher-custody inmates, or being quarantined. Likewise, plaintiff does not show that he suffered more than minimal harm or even the threat of harm when a grievance and his phone book were placed in another inmate's property box. Indeed, plaintiff presents no evidence that the other inmate saw plaintiff's grievance or knew plaintiff had complained about

---

Motion to Amend, these allegations do not state viable claims for retaliation. *See* Order dated July 26, 2020 (ECF No. 86).

13 - OPINION AND ORDER

sharing dayroom time with him. Thus, plaintiff fails to sustain claims of retaliation based on these incidents.

Remaining is plaintiff's retaliation claim arising from the issuance of a misconduct report and resulting disciplinary sanction. While a disciplinary sanction constitutes an adverse action, plaintiff fails to present evidence suggesting that he was disciplined because of his protected conduct or that the disciplinary sanction failed to advance a legitimate correctional goal.

On June 7, 2020, Officer Hoppe prepared an Incident Report stating that he saw plaintiff standing on his sink and instructed Deputy Baeuerlen to speak with plaintiff about his conduct. Second Counsel Decl. Ex. 1 at 1 (ECF No. 85-1). According to the Incident Report, Deputy Baeuerlen told plaintiff to stop standing on his sink and plaintiff responded, "OK, Man." *Id.* Officer Hoppe subsequently witnessed plaintiff stand on his sink several more times, and he directed Deputy Baeuerlen to speak with plaintiff again. *Id.* Deputy Baeuerlen directed plaintiff to stay off of the sink. Officer Hoppe subsequently issued a misconduct report based on plaintiff's failure to comply with an officer's orders. *Id.*

In response to the Incident Report, plaintiff asserted that Deputy Baeuerlen only asked plaintiff "what [he] was standing on" the first time he spoke with plaintiff and did not specifically direct plaintiff to stay off of the sink until he approached plaintiff a second time. Second Counsel Decl. Ex. 1 at 2. Plaintiff maintained that he did not climb onto his sink after Deputy Baeuerlen specifically told him not to and claimed it was a "misunderstanding." *Id.* Plaintiff also presented the statement of a witness who stated that Deputy Baeuerlen did not specifically direct plaintiff to stop standing on the sink until he approached plaintiff the second time. *Id.*

14 - OPINION AND ORDER

On June 9, 2020, a disciplinary hearing was held before Sgt. Rosander. Plaintiff admitted standing on his sink but stated that he did not do so after Deputy Baeuerlen approached him a second time and told him to stop. Plaintiff argued there must have been "confusion" because the officer who issued the misconduct report was not the officer who told him to stop standing on the sink. *Id.* Ex. 1 at 4. Plaintiff also presented the statement of his witness, as described above.

Sgt. Rosander found by a preponderance of the evidence that plaintiff violated an order given by Deputy Baeuerlen, based on the statements of the deputy, video evidence, and the witness's statement. *Id.* Plaintiff received a disciplinary sanction of seven days in disciplinary housing and was housed in the disciplinary unit from June 9 to June 16, 2020. Rice Decl. ¶ 34.

Plaintiff does not present evidence showing that he received the misconduct report or disciplinary sanction because of his protected conduct. Plaintiff relies a jail log reflecting that some LCAC officers or deputies knew in late May that plaintiff intended to initiate a lawsuit against LCAC. Pl.'s Resp. "Retaliation 2 and 3" (ECF No. 81 at 47-48). However, timing alone does not necessarily establish causation, and plaintiff's evidence does not indicate that Officer Hoppe, Deputy Baeuerlen, or Sgt. Rosander read the jail log on those days or otherwise had knowledge of plaintiff's lawsuit. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (noting that while "timing can properly be considered as circumstantial evidence of retaliatory intent," it is not always sufficient to support such an inference).

Even if their knowledge and causation could be inferred from the jail log, plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Id.* at 806. He fails to meet this burden. Plaintiff does not dispute that he repeatedly stood on his sink after Deputy Baeuerlen approached him the first time, and he relied on semantics to argue that the deputy did not specifically direct him to stay off of his sink.

15 - OPINION AND ORDER

Regardless of whether miscommunication or confusion occurred, the disciplinary sanction was supported by "some evidence" and does not support an inference of retaliation. Given the circumstances and the disciplinary findings, plaintiff does not show that the misconduct report and resulting disciplinary sanction failed to advance a legitimate penological goal.

In his response to defendants' motion, plaintiff also suggests that the disciplinary proceeding violated his procedural due process rights. Plaintiff is incorrect.

In the context of disciplinary actions, due process requirements are met if an inmate receives: 1) advance written notice of the charges and the evidence against him; 2) an opportunity to present documentary evidence and witnesses; 3) legal assistance if the charges are complex or the inmate is illiterate; 4) a written statement describing the reasons for the disciplinary action; and 5) a disciplinary decision supported by "some evidence in the record." *Wolff v. McDonnell*, 418 U.S. 539, 563, 565-66, 570 (1974); *see also Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985). The record reflects that plaintiff received notice of the alleged rule violation, the opportunity to present a witness statement, a statement of reasons for the disciplinary findings, and a decision supported by "some evidence." Second Counsel Decl. & Exs. Plaintiff received the process he was due.

## CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 60) is GRANTED, and this action is DISMISSED.

IT IS SO ORDERED.

DATED this  24th  day of January, 2022.

                                        /s/Ann Aiken
                                         Ann Aiken
                                 United States District Judge